**MARTIN LUTHER KING JUNIOR ELE-
MENTARY SCHOOL CHILDREN
et al., Plaintiffs,**

v.

**ANN ARBOR SCHOOL DISTRICT
BOARD, Defendant.**

Civ. A. No. 7–71861.

United States District Court,
E. D. Michigan, S. D.

July 12, 1979.
On Submission of Plan Aug. 24, 1979.

**1372**

Gabe Kaimowitz, Kenneth Lee Lewis, Michigan Legal Services, Detroit, Mich., for plaintiffs.

John B. Weaver, John H. Dudley, Jr., Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

The issue before this court is whether the defendant School Board has violated Section 1703(f) of Title 20 of the United States Code as its actions relate to the 11 black children who are plaintiffs in this case and who are students in the Martin Luther King Junior Elementary School operated by the defendant School Board. It is alleged that the children speak a version of "black English," "black vernacular" or "black dialect" as their home and community language that impedes their equal participation in the instructional programs, and that the school has not taken appropriate action to overcome the barrier.

The statute under which this action is now pressed reads as follows: [1]

> No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—
>
> \*     \*     \*     \*     \*     \*
>
> (f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

20 U.S.C. 1703(f).

A major goal of American education in general, and of King School in particular, is to train young people to communicate both orally (speaking and understanding oral speech) and in writing (reading and understanding the written word and writing so that others can understand it) in the standard vernacular of society. The art of communication among the people of the country in all aspects of people's lives is a basic building block in the development of each individual. Children need to learn to speak and understand and to read and write the language used by society to carry on its business, to develop its science, arts and culture, and to carry on its professions and governmental functions. Therefore, a major goal of a school system is to teach reading, writing, speaking and understanding standard English.

The problem in this case revolves around the ability of the school system, King School is particular, to teach the reading of standard English to children who, it is al-

---

[1]. Section 1706 of Title 20 gives to an individual who has been denied an equal educational opportunity the right to institute a civil action in the appropriate District Court of the United States for violation of 20 U.S.C. § 1703.

leged, speak "black English" as a matter of course at home and in their home community (the Green Road Housing Development).

This case is not an effort on the part of the plaintiffs to require that they be taught "black English" or that their instruction throughout their schooling be in "black English," or that a dual language program be provided. In this respect, it is different from the facts in *Cintron v. Brentwood Union Free School District*, 455 F.Supp. 57 (E.D.N.Y.1978). It is a straightforward effort to require the court to intervene on the children's behalf to require the defendant School District Board to take appropriate action to teach them to read in the standard English of the school, the commercial world, the arts, science and professions. This action is a cry for judicial help in opening the doors to the establishment. Plaintiffs' counsel says that it is an action to keep another generation from becoming functionally illiterate. The statute set out above is the remaining basis for the plaintiffs' claims.

*HISTORY OF LITIGATION TO DATE*

This action was commenced on July 28, 1977 by 15 black pre-school or elementary school children residing in a housing project located on Green Road in Ann Arbor, Michigan, all of whom either were attending or were eligible to attend Martin Luther King Junior Elementary School in that city. The plaintiffs asserted that the defendant Ann Arbor School District Board and the Michigan State Board of Education, along with certain individual teachers and administrators, violated the law in a number of respects. They alleged that in the process of determining the eligibility of all students for special education services, pursuant to M.C.L.A. § 380.1701 *et seq.*, the defendants had failed to determine whether the plaintiffs' learning difficulties stemmed from cultural, social or economic deprivation. They demanded the establishment of a program which would enable plaintiffs to overcome the cultural, social and economic deprivations which allegedly prevented them in varying degrees from making normal progress in school. The plaintiffs asserted that these omissions constitute a violation of:

1. Their civil rights protected by 42 U.S.C. §§ 1983 and 1985(3);

2. Their rights to equal protection of the laws guaranteed by the Fourteenth Amendment of the United States Constitution;

3. Their right to equal educational opportunity protected by 20 U.S.C. §§ 1703(f) and 1706;

4. Their right to the benefits of federal financial assistance, pursuant to 42 U.S.C. § 2000d;

5. Their right to a free education guaranteed by Articles VIII and II of the Michigan Constitution and M.C.L.A. § 380.1147; and

6. Their right to be free from tortious abrogation of their constitutional rights.

This court at an earlier date considered motions filed by the defendants and has dismissed all of the claims made relating to cultural, social and economic deprivations and all but the claim made by the plaintiffs under Sections 1703(f) and 1706 of Title 20 of the United States Code. *Martin Luther King School Children v. Michigan Board of Education*, 463 F.Supp. 1027 (E.D.Mich. 1978). The court also denied the request of the plaintiffs for a preliminary injunction and to have this action certified as a class action.[2] Since that time this court, at the request of the plaintiffs, has dismissed the Michigan Superintendent of Public Instruction and his employees, agents and assigns in their official capacities, and the Michigan Board of Education from the action. The court has also stricken four of the plaintiff children from the action because they have since moved out of the school district.

*THE PARTIES TO THIS LITIGATION*

*THE PLAINTIFFS*

Each of the plaintiff children is or has been a student at the Martin Luther King Junior Elementary School. Each of them resides in the Green Road Housing Project

---

**2.** Court Order dated September 23, 1977.

in Ann Arbor, a small public housing project established as a part of an effort to provide "scatter housing" for low income families in the city of Ann Arbor. Green Road Housing Project is located in a middle to upper income residential area next to the University of Michigan's North Campus. Each of the plaintiff children is a black child. They are among more than 500 children in attendance at the King School. Each of the children has experienced reading difficulties sometime during his or her time at the King School.

1. Michael Blair is completing the 7th grade at Clague Middle School. He attended King School from kindergarten through the 6th grade.

2. Anthony Blair is completing the 6th grade at King School and will attend Clague Middle School in the fall of 1979. He has attended King School from kindergarten through the 6th grade.

3. Gerard Blair is at the present time repeating 2nd grade at King School. He has attended King School from kindergarten through the 2nd grade.

4. Tyrone Blair is completing the 1st grade at King School. He also attended kindergarten at King School.

5. Dwayne Brenen is completing the 7th grade at Clague Middle School. He attended King School for grades 1 through 6 and part of kindergarten.

6. Kihilee Brenen is completing the 4th grade at the Northside Elementary School. He attended King School for kindergarten and the 1st grade. He transferred from King to Northside after one month in the 2nd grade.

7. Tito Brenen is completing the 1st grade at King School. He attended kindergarten at King School last year.

8. Carolyn Davis is completing the 6th grade at King School. She will attend Clague Middle School in the fall of 1979. She attended King School for grades 3 through 6.

9. Gary Davis is completing the 4th grade at King School. He attended grades 1 through 4 at King.

10. Jacqueline Davis is completing the 3rd grade at King School. She attended kindergarten through 3rd grade at King School.

11. Tyrone Davis is completing the 1st grade at King School. He attended kindergarten at King School last year.

*THE DEFENDANT*

The Ann Arbor School District Board operates the Martin Luther King Junior Elementary School. The school is comprised of a school population which is approximately 80% white, 13% black and 7% Asian, Latino, or other. There are 20 teachers on the faculty, 3 of whom are black. There is no evidence in the case to indicate that the Ann Arbor School District Board currently operates a dual school system or that it has done so in the past. In fact the evidence suggests that the ethnic makeup of the student and teacher population at King School is substantially in line with that of the district.

The Martin Luther King Junior Elementary School has available to its instructional staff one or more learning consultants or helping teachers, a speech therapist, a psychologist, and a language consultant. These professionals are used by the staff in accordance with the rules of the School Board and law to provide additional assistance in connection with the educational program of the school. In addition, the school arranges for special tutors and at times utilizes parent helpers.

*ISSUES*

Section 1703(f) of Title 20, U.S.C., set out above, is the sole remaining basis for the plaintiffs' claims.

The issues raised by the language of 20 U.S.C. § 1703(f) are:

1. Whether the children have a language barrier.

2. Whether, if they have a language barrier, that barrier impedes their equal participation in the instructional program offered by the defendant. (In this case the evidence has largely been directed at learning to read, the most basic of all instructional programs of the school.)

3. Whether, if there is a barrier that does so impede, the defendant Board has taken "appropriate action to overcome the language barrier."

4. Whether, if the defendant Board has not taken "appropriate action," this failure denies equal educational opportunity to plaintiffs "on account of race."

The case is divided for discussion into three distinct parts. The first part involves a description of what has been established by the evidence as that body of knowledge known generally by linguists, psychologists and educators about the problems presented. The second part looks at the educational program in King School as it relates to the particular children in this case. The third part applies the legal rules to the evidence as set out in the first two parts.

I

REPORT ON CURRENT STATE
OF KNOWLEDGE

■ The court heard from a number of distinguished and renowned researchers and professionals who told the court about their research and discoveries involving "black English" and how it impacts on the teaching of standard English.[3] They also informed the court on the results of other research relied on by professionals and expressed their opinions. Information about this area of education and linguistics is being uncovered as rapidly as research projects are reaching maturity. The court believes that the research results and the opinions of the researchers and professionals are better received as evidence in the case, on the record and subject to cross-examination, than simply by reading the re-

ports and giving consideration to what appears in those reports as was done in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The knowledge produced by the various research projects forms a background basis against which the actions of the School District Board and the teachers in this case can be tested. The research product does permit inferences to be drawn but it must be remembered that this case is a case against one school board for its actions and it must be judged for its actions alone. "[S]chools are not fungible and the fact that some or even most may practice discrimination does not warrant blanket condemnation." *Norwood v. Harrison,* 413 U.S. 455, 471, 93 S.Ct. 2804, 2813, 37 L.Ed.2d 723 (1973). The following is a brief summary of some of the research reported as it relates to the problems before the court.

*LANGUAGE BARRIER*

All of the distinguished researchers and professionals testified as to the existence of a language system, which is a part of the English language but different in significant respects from the standard English used in the school setting, the commercial world, the world of the arts and science, among the professions and in government. It is and has been used at some time by 80% of the black people of this country and has as its genesis the transactional or pidgin language of the slaves, which after a generation or two became a Creole language. Since then it has constantly been refined and brought closer to the standard English as blacks have been brought closer to the mainstream of society. It still flourishes in areas where there are concentrations of

---

3. Geneva Smitherman, Professor of Speech Communication and Director of the Center for Black Studies, Wayne State University;
Daniel N. Fader, Professor of English Language and Literature, University of Michigan;
Jerrie Scott, Assistant Professor of English and Linguistics, University of Florida;
William Labov, Professor of Linguistics at the University of Pennsylvania, with a secondary appointment in Psychology and Education;

J. L. Dillard, Assistant Professor, Department of Languages, Northwestern State University, Natchitoches, Louisiana;
Gary Simpkins, Director of Social Health Services and Chief of Mental Health, Watts Health Foundation;
Richard Bailey, Professor of English, University of Michigan;
Ronald Edmunds, Member of Faculty, Harvard Graduate School of Education; and
Kenneth Haskins, President, Roxbury Community College.

black people. It contains aspects of Southern dialect and is used largely by black people in their casual conversation and informal talk. There are many characteristic features found in "black English" but some of the principal ones identified by the testifying experts as being significant are:

1. The use of the verb "be" to indicate a reality that is recurring or continuous over time.

2. The deletion of some form of the verb "to be."

3. The use of the third person singular verbs without adding the "s" or "z" sound.

4. The use of the "f" sound for the "th" sound at the end or in the middle of a word.

5. The use of an additional word to denote plurals rather than adding an "s" to the noun.

6. Non-use of "s" to indicate possessives.

7. The elimination of "l" or "r" sounds in words.

8. The use of words with different meanings.

9. The lack of emphasis on the use of tense in verbs.

10. The deletion of final consonants.

11. The use of double subjects.

12. The use of "it" instead of "there."

The features of this language system have been described in a number of carefully researched projects.[4]

The substance of the thoughtful testimony of the experts also indicated that because "black English" does not discriminate among some sounds which are distinguished in standard English, teachers experience difficulty in getting the students to use correct pronunciation. The experts further testified, however, that efforts to instruct the children in standard English by teachers who failed to appreciate that the children speak a dialect which is acceptable in the home and peer community can result in the children becoming ashamed of their language, and thus impede the learning process. In this respect, the black dialect appears to be different than the usual foreign languages because a foreign language is not looked down on by the teachers. The evidence also suggests that there are fewer reading role models among the poor black families than among families in the rest of society.

Finally, it is clear that black children who succeed, and many do, learn to be bilingual. They retain fluency in "black English" to maintain status in the community and they become fluent in standard English to succeed in the general society. They achieve in this way by learning to "code switch" from one to the other depending on the circumstances.

All of the experts testified that the language used is a specific system that has been used by blacks and continues to be used by blacks in casual conversation and informal talk. It is a language system having its genesis among black people. In many areas of the country where blacks predominate, many among them, particularly the poor and those with lesser education and their children, speak this dialect among themselves although they may be quite capable of speaking eloquently in standard English and although they do speak standard English when talking to community outsiders. "Black English" is a dialect of a segment of the black population and is used by them only a part of the time.

4. G. Smitherman, *A Comparison of the Oral and Written Styles of a Group of Inner-City Black Students*, Ph.D. dissertation, University of Michigan, (1969);

G. Smitherman, *Talkin' and Testifyin': The Language of Black America*, (1977);

J. L. Dillard, *Black English*, (1972);

W. Labov, *The Study of Nonstandard English*, (1970);

W. Labov, "The Logic of Non-Standard English," *Linguistic-Cultural Differences and American Education*, Special Edition of the *Florida Foreign Language Reporter*, (Spring/Summer, 1969);

R. Fasold and R. Shuy, *Teaching Standard English in the Inner City*, (1970);

W. Wolfram, *A Sociolinguistic Description of Detroit Negro Speech*, (1969);

R. Burling, *English in Black and White*, (1973);

R. Abrahams and R. Troike, eds. *Language and Cultural Diversity in American Education*, (1972).

## IMPEDIMENTS TO EQUAL PARTICIPATION IN THE INSTRUCTIONAL PROGRAM

A child who does not learn to read is impeded in equal participation in the educational programs. Such a child cannot fully participate in the educational programs which to a significant degree require the student to acquire knowledge from the written word. Reading of all kinds is a major method by which modern society passes on its information and culture among its members and to its children. It is the way in which society conveys its commands and gives direction to its members.

The research evidence supports the theory that the learning of reading can be hurt by teachers who reject students because of the "mistakes" or "errors" made in oral speech by "black English" speaking children who are learning standard English. This comes about because "black English" is commonly thought of as an inferior method of speech and those who use this system may be thought of as "dumb" or "inferior." The child who comes to school using the "black English" system of communication and who is taught that this is wrong loses a sense of values related to mother and close friends and siblings and may rebel at efforts by his teachers to teach reading in a different language.[5]

## APPROPRIATE ACTION

The experts offered a number of suggestions of what is appropriate action. Dr. Geneva Smitherman suggested that highly skilled linguists are needed to teach the children. Others suggested that children's speech should not be corrected initially until the correction can be made without upsetting the child and the feelings toward mother and home.

Others suggested that students should be started in "black English" and then bridged into standard English and that persons using standard English should also be reverse bridged into "black English."

Others suggested the use of specifically identified reading programs, some of which are written in "black English." The use of books of all sorts, including comic books, was urged to induce the unmotivated to read.

Dr. Dan Fader stressed the need to make certain that the school system provides models for accepting reading as an important and standard part of a person's life. Particularly for students who do not have parents and siblings who read at home, it is important, he stressed, that children see people read and that they understand that what people read affirmatively affects their lives. He suggests that time must be set aside in each school during which everyone —children, teachers, administrators, secretaries, janitors, and all others who are present in the school system—reads, and then, in later conversation, attempts to convey what was gained from the reading. Dr. Fader suggests that the real problem comes from the 4th grade on when the students' extracurricular activities compete for their time and energy. At this time, the students lose interest, particularly if they don't see value in continuing to develop their reading skills, unless they are specially motivated by parents, peers or teachers. For this reason, he suggests adult reading models outside the home be brought to bear upon the children's lives.

5. J. L. Dillard, *Black English*, (1972);
A. Covington, "Teachers' Attitudes Toward Black English: Effects on Student Achievement," in *Ebonics: The True Language of Black Folks*, (R. Williams, ed. 1975);
W. Labov, "The Logic of Non-Standard English," *Linguistic-Cultural Differences and American Education*, Special Edition of the *Florida Foreign Language Reporter*, (Spring/Summer 1969);
G. Smitherman, *A Comparison of the Oral and Written Styles of a Group of Inner-City Black Students*, Ph.D. dissertation, University of Michigan, (1969);
G. Smitherman, *Talkin' and Testifyin': The Language of Black America*, (1977);
R. Fasold and R. Shuy, *Teaching Standard English in the Inner City*, (1970);
R. Burling, *English in Black and White*, (1973);
R. Abrahams and R. Troike, eds., *Language and Cultural Diversity in American Education*, (1972).

Dr. Ronald Edmunds reported on conclusions drawn from an extensive research project on "Search for Effective Schools." After having utilized an acceptable, well-developed procedure, he has identified 5 criteria essential to an effective school. He defines an effective school as one in which all but severely handicapped children achieve in math and reading to a satisfactory degree when measured not against each other but against a concrete body of knowledge. It appears that Dr. Edmunds has contributed much to assist school boards and major school administrators in understanding and assessing the quality of their educational efforts.

Dr. Edmunds' criteria for an effective school are:

1. Style of leadership in the building—strong principal. Participation by principal in basic classroom decisions relating to how the day is organized and how time is spent and what materials to use and subjects to emphasize.

2. Emphasis on learning and teaching by everyone in the building, including janitors, secretaries, parents, as well as teachers and students.

3. Building ambience: a clean, orderly, safe environment.

4. Teaching expectations—all students are expected to profit from what goes on in the school.

5. Presence of a standard testing device to measure pupil progress in relation to the school's emphasis.

The sum total of the testimony of the experts was a series of suggestions that are clearly appropriate for consideration by administrators and teachers.

Plaintiffs themselves urge a simple remedy. They would require the defendant School Board to identify each student who speaks "black English" and then use the best of the knowledge available in the Ann Arbor school system to teach standard English, after taking into account the "black English" background of the children.

## SUMMARY

The language of "black English" has been shown to be a distinct, definable version of English, different from standard English of the school and the general world of communications. It has definite language patterns, syntax, grammar and history.

In some communities and among some people in this country, it is the customary mode of oral, informal communication.

A significant number of blacks in the United States use or have used some version of "black English" in oral communications. Many of them incorporate one or more aspects of "black English" in their more formal talk.

"Black English" is not a language used by the mainstream of society—black or white. It is not an acceptable method of communication in the educational world, in the commercial community, in the community of the arts and science, or among professionals. It is largely a system that is used in casual and informal communication among the poor and lesser educated.

The instruction in standard English of children who use "black English" at home by insensitive teachers who treat the children's language system as inferior can cause a barrier to learning to read and use standard English. The language is not as discriminating in its use of sounds as is standard English and much of its grammar is simpler. There are fewer reading models in the life of a child who uses "black English."

## II

## APPLICATION OF THE CURRENT STATE OF KNOWLEDGE TO THE CHILDREN IN THIS CASE AND KING SCHOOL

### LANGUAGE BARRIER

The plaintiff children use a version of "black English" in their informal conversations in their homes and in the small community of the Green Road Housing Development. It is the accepted way of speaking in that environment. Their mothers some-

times use a version of "black English" in speaking with the children in the home setting, but can speak standard English. The mothers testified clearly in standard English and a number of letters written by one or more of them appear in the record and show that they can use standard English effectively.

The teachers in King School had no difficulty in understanding the students or their parents in the school setting and the children could understand the teachers and other children in that setting. In other words, so far as understanding is concerned in the school setting, although there was initially a type of language difference, there was no barrier to understanding caused by the language.

There seems to be no problem existing in this case relating to communication between the children and their teachers or between the children and other children in the school. The answers given by plaintiffs to interrogatories posed by defendants confirm this finding.

Although the evidence in this case indicates that the plaintiffs at time speak "black English" at home, they also to a greater or lesser degree depending on age speak and understand standard English in school and in the home.

If a barrier exists because of the language used by the children in this case, it exists not because the teachers and students cannot understand each other, but because in the process of attempting to teach the students how to speak standard English the students are made somehow to feel inferior and are thereby turned off from the learning process.

There is no direct evidence that any of the teachers in this case has treated the home language of the children as inferior, but it is clear to the court that although some of the teachers rebel at calling the home language "black English" they are acutely aware of it. Each teacher, the court believes, makes his or her own assessment of the language system used by the student in the home environment and attempts to use all of his or her skills to teach the student to read and speak standard English. The teachers do not, however, admit to taking that system into account in helping the student read standard English.

It is not an issue in this case that the students have been misclassified as handicapped. The procedures used in making the classifications completely follow the law.

As indicated later in this memorandum, the teachers all testified that they treated the plaintiff students just as they treated other students. In so doing, they may have created a barrier to learning reading if the research reported is to be given any credence. The reason the teachers are teaching standard English is because it is the language by which the mainstream of society operates. The vernacular of "black English" has never been such a language. By requiring a student to switch without even recognizing that he or she is switching impedes the learning of reading standard English.

## ACTIONS TAKEN BY TEACHERS AT KING SCHOOL

Each of the teachers who testified in this case testified that he or she attempts to use a variety of materials that are standard for teaching reading. Some of these materials are specially designed to help students who speak "black English" to learn to read standard English. The materials are used in the way in which the materials are designed to be used. Although the teachers give special attention to the plaintiff students and have provided an exceptional amount of special assistance in connection with their efforts to help them read, they do not treat them differently from other students in the class. They indicated that the plaintiff children are treated the same way as are students from Japan, China, Korea, Greece, and Spain, who are learning English while they are going to school. They do not use special methods or criteria or procedures to teach "black English" speaking youngsters. They do use books that are prepared by well-regarded teachers of reading and published by well-regarded educational publishers, and that assist students to

learn and develop in accordance with their capabilities. Some of these books and materials are the very ones suggested as appropriate by the experts testifying in the case. As students change in ability, they shift to more difficult or easier material. On one occasion, one student was held back a grade when the language proficiency was not sufficient to permit the student to succeed in the higher grade. That student was benefited by the grade retention. The students have been provided with assistance in reading help and some of them have been offered tailor-made programs in oral reading and phonics for their assistance. By way of example, the students in this case have received the following type of assistance:

A. Michael Blair received assistance in reading from a helping teacher during four of the seven grades he attended at King School. A curriculum plan devised for Michael by the teacher consultant during the 5th grade recommended the encouragement of his individual reading by the use of magazines, newspapers, comic books and a variety of paperbacks.

B. Anthony Blair received the assistance of a helping teacher in the 3rd grade and was instructed on a one-on-one basis in the 4th grade.

C. Gerard Blair received the assistance of a teacher aide in the 1st grade and he worked with a teacher consultant in the 2nd grade. He was retained in 2nd grade for the year 1978–79.

D. Tyrone Blair received the assistance of a speech and language specialist during pre-school and worked at individual reading with his teacher in the 1st grade.

E. Tito Brenen was given one-to-one tutoring in kindergarten.

F. Gary Davis received 30 minutes or more individual reading help per day from his 1st grade teacher.

G. Jacqueline Davis had individual teacher help in reading during the 1st grade and worked with a teacher/consultant during the 2nd and 3rd grades.

H. Tyrone Davis received the assistance of a speech therapist in kindergarten for a severe multiple articulation problem.

There is no evidence in this case that any instructional program has been withheld from any plaintiff on account of his or her race.

## IMPEDIMENTS TO EQUAL PARTICIPATION IN THE INSTRUCTIONAL PROGRAM

The evidence in this case suggests that each teacher made every effort to help and used the many and varied resources of the school system to try to teach the students to learn to read.

The evidence also suggests that the students, depending on their age, communicate orally quite well in standard English and except for a few limited times most, if not all, in-school talking is done in standard English.

The court heard from each of the children. They are attractive, likeable, at times shy, youngsters. Their speech in court was highly intelligible and contained only traces of "black English." This is true although the court heard tapes played of the same children in casual conversation in which talking among themselves their speech was a true "black English" vernacular. In oral speech, though, they seem to quickly adapt to standard English in settings where it appears to be the proper language.

The facts in this case indicate, however, that these children have not developed reading skills and the failure to develop these skills impedes equal participation in the instructional program.

The toughest question is whether it has been established that the failure to develop reading skills was caused by the language barrier. The evidence suggests other causes, such as absences from class, learning disabilities, and emotional impairment. However, the evidence also suggests that an additional cause of the failure to learn to read is the barrier caused by the failure of the teachers to take into account the "black English" home language of the children in

trying to help them switch to reading standard English. When that occurs, the research indicates that some children will turn off and will not learn to read.

The court cannot find that the defendant School Board has taken steps (1) to help the teachers understand the problem; (2) to help provide them with knowledge about the children's use of a "black English" language system; and (3) to suggest ways and means of using that knowledge in teaching the students to read.

## III

## APPLICATION OF LAW TO FACTS

When Congress enacted the Equal Educational Opportunities Act of 1974, it was responding to suggestions that attention should be shifted from busing to better education. In his message to Congress, the President urged the enactment of what is now § 1703 to provide a "broader base on which to decide future cases." He indicated that the statute should set "standards for all school districts throughout the Nation, as the basic requirements for carrying out, in the field of public education, the Constitutional guarantee that each person shall have equal protection of the laws." 118 Cong.Rec. 8931 (1972).

This effort went far beyond requiring standards of equal education for formerly segregated dual systems of education. It was intended to embrace all school systems under the Equal Protection Clause of the Fourteenth Amendment and the authority granted in that amendment to "enforce, by appropriate legislation, the provisions of this Article." *See Martin Luther King School Children v. Michigan Board of Education*, 463 F.Supp. 1027 (E.D.Mich. 1978).

This case is a judicial investigation of a school's response to language, a language used in informal and casual oral communication among many blacks but a language that is not accepted as an appropriate means of communication among people in their professional roles in society. The plaintiffs have attempted to put before this

court one of the most important and pervasive problems facing modern urban America—the problem of why "Johnnie Can't Read" when Johnnie is black and comes from a scatter low income housing unit, set down in an upper middle class area of one of America's most liberal and forward-looking cities.

The problem posed by this case is one which the evidence indicates has been compounded by efforts on the part of society to fully integrate blacks into the mainstream of society by relying solely on simplistic devices such as scatter housing and busing of students. Full integration and equal opportunity require much more and one of the matters requiring more attention is the teaching of the young blacks to read standard English.

Some evidence suggests that the teachers in the schools which are "ideally" integrated such as King do not succeed as well with the minority black students in teaching language arts as did many of the teachers of black children before integration. The problem, of course, is multi-dimensional, but the language of the home environment may be one of the dimensions. It is a problem that every thoughtful citizen has pondered, and that school boards, school administrators and teachers are striving to solve.

Research indicates that the black dialect or vernacular used at home by black students in general makes it more difficult for such children to learn to read for three reasons:

1. There is a lack of parental or other home support for developing reading skills in standard English, including the absence of persons in the home who read, enjoy it and profit from it.

2. Students experience difficulty in hearing and making certain sounds used discriminatively in standard English, but not distinguished in the home language system.

3. The unconscious but evident attitude of teachers toward the home language causes a psychological barrier to learning by the student.

Evidence is lacking in this case about parental reading models, although the mothers clearly have evidenced interest in the success of their children. There is no evidence that any of the teachers have in any way intentionally caused psychological barriers to learning. The mothers and the children were complimentary of their teachers. But the evidence does clearly establish that unless those instructing in reading recognize (1) the existence of a home language used by the children in their own community for much of their non-school communications, and (2) that this home language may be a cause of the superficial difficulties in speaking standard English, great harm will be done. The child may withdraw or may act out frustrations and may not learn to read. A language barrier develops when teachers, in helping the child to switch from the home ("black English") language to standard English, refuse to admit the existence of a language that is the acceptable way of talking in his local community.

■ The facts and law thus establish:

1. The plaintiff children do speak at home and in their local community a language that is not itself a language barrier. It is not a barrier to understanding in the classroom. It becomes a language barrier when the teachers do not take it into account in teaching standard English.

2. The evidence supports a finding that the barrier caused by a failure on the part of the defendant to develop a program to assist their teachers to take into account the home language in teaching standard English may be one of the causes of the children's reading problems.

3. The inability to read at grade level does impede the children's equal participation in the educational program of the school.

4. To the extent the defendant School Board has failed to take appropriate action, that failure impacts on race.

5. The obligation of the school system in this case is to take appropriate action to overcome the language barrier.

The court in this case has indicated that it has heard from impressive and experienced educators and researchers in the field of teaching reading who have pointed ways to the effective teaching of reading. A large amount of what has been testified to as appropriate action has been tried at King in one or another form. Materials suggested are available and have been used. It may be true that had the Ann Arbor school system used all of the ways suggested by the experts who testified in this case, some different results could have been achieved. It does not, however, seem to the court that the judicial forum is the appropriate place to make determinations of this sort. What is "appropriate" is not what this court believes should be done in light of evidence presented in this case. The courts are not the place to test the validity of educational programs and pedagogical methods. It is not for the courts to harmonize conflicting objectives by making judgments involving issues of pedagogy.

The appropriate standard is to examine the actions of the defendant School District Board and its teachers in this case and determine whether they make judgments and decisions in light of information they reasonably could be expected to have and that those judgments and decisions are rational. They may not act blindly, callously, and thoughtlessly, without care. They must have as their goal the congressional requirement, the elimination of existing language barriers, and the steps that they take must be rational and logical in light of the situation confronting them and the knowledge reasonably available to them.

■ Except in one respect the defendant does take appropriate action to overcome the language barrier. The defendant's teachers do act in a responsible and rational manner to try to help the children. The mere fact that the defendant does or does not adopt a particular program demonstrated to this court as being effective does not permit this court to hold that the defendant has not taken appropriate action under the statute. The defendant has done much and the court finds, except as indicated below,

that what it has done is appropriate under the statute, even though the court, other administrators, or other teachers might try something different.

■ However, the evidence suggests clearly that no matter how well intentioned the teachers are, they are not likely to be successful in overcoming the language barrier caused by their failure to take into account the home language system, unless they are helped by the defendant to recognize the existence of the language system used by the children in their home community and to use that knowledge as a way of helping the children to learn to read standard English.

The failure of the defendant Board to provide leadership and help for its teachers in learning about the existence of "black English" as ·a home and community language of many black students and to suggest to those same teachers ways and means of using that knowledge in teaching the black children code switching skills in connection with reading standard English is not rational in light of existing knowledge on the subject.

Section 1706 of Title 20 provides that an individual who has been "denied an equal educational opportunity" (as defined in § 1703) may "institute a civil action . . for such relief as may be appropriate."

■■ Although this statute is a direct congressional mandate to the federal courts to become involved in matters of this kind, this statute makes it clear that discretion is given to the judge to determine what is "appropriate." Accordingly, this court finds it appropriate to require the defendant Board to take steps to help its teachers to recognize the home language of the students and to use that knowledge in their attempts to teach reading skills in standard English. It is the intention of this court that the method of using the students' home language in teaching reading of standard English meet the test of reasonableness and rationality in light of knowledge on the subject. It is not the intention of this court to tell educators how to educate,

but only to see that this defendant carries out an obligation imposed by law to help the teachers use existing knowledge as this may bear on appropriate action to overcome language barriers.

The other two factors particularly identified as creating difficulty in learning to read standard English are not the appropriate subject for court order. The court does not believe the language difference between "black English" and standard English to be a language barrier in and of itself. The court cannot deal with the reading role model problem. In one sense it is a cultural, economic and social problem and not a language problem and thus is beyond the issues in this action. In the other sense its remedies involve pedagogical judgments that are for the educators and not for the courts.

The claims against the defendants other than the defendant School Board are dismissed. No action against individuals is permitted under 20 U.S.C. § 1706.

Counsel for the defendant is directed to submit to this court within thirty (30) days a proposed plan *defining the exact steps to be taken* (1) to help the teachers of the plaintiff children at King School to identify children speaking "black English" and the language spoken as a home or community language, and (2) to use that knowledge in teaching such students how to read standard English. The plan must embrace within its terms the elementary school teachers of the plaintiff children at Martin Luther King Junior Elementary School. If the defendant chooses, however, it may submit a broader plan for the court's consideration, e. g., one embracing other elementary schools.

So ordered.

### ON SUBMISSION OF PLAN

This court has directed the defendant School District Board to submit a proposed plan defining the exact steps to be taken, (1) to help the teachers of the plaintiff children at King School to identify children speaking "black English" and the language spoken as a home or community ,language,

and (2) to use that knowledge in teaching such children how to read standard English.

This ruling was a result of findings that the School District Board was in violation of Title 20, United States Code, § 1703(f), which reads as follows:

No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—

\* \* \* \* \* \*

'(f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

The court found:

1. That a language barrier existed between the plaintiff children and the teachers in the Martin Luther King Junior Elementary School because of the failure of the teachers to take into account the home language or dialect of the children in trying to teach them to read standard English. This was caused by the failure on the part of the defendant School Board to develop a program to assist the teachers in this respect.

2. That the dialect spoken by the children is a version of English called "black English" and is related to race.

3. That the barrier was one of the causes of the children's reading problems which they all experienced and which impeded the children's equal participation in the school's educational program.

4. That the statute enacted in 1974 by Congress directs the school system to take appropriate action to overcome the language barrier.

As a result of these findings, the School Board was directed to file a plan of "appropriate action."

The court, in its earlier opinion, was careful to point out that it was dealing only with the statutory mandate as evidenced by the law passed by Congress and was not dealing with educational policy. It said: "It is not the intention of this court to tell educators how to educate, but only to see that this defendant carries out an obligation imposed by law to help the teachers use existing knowledge as this may bear on appropriate action to overcome language barriers." (P. 1383). It indicated that: "It is the intention of this court that the method of using the students' home language in teaching reading of standard English meet the test of reasonableness and rationality in light of knowledge on the subject." (P. 1383). And it said: "It does not, however, seem to the court that the judicial forum is the appropriate place to make determinations of this sort [decision as to how to teach reading]. What is 'appropriate' is not what this court believes should be done in light of evidence presented in this case. The courts are not the place to test the validity of educational programs and pedagogical methods. It is not for the courts to harmonize conflicting objectives by making judgments involving issues of pedagogy." (P. 1382).

These statements were an attempt to point out that the court was dealing with legal obligations imposed by Congress upon the School District Board. It was not attempting to dictate educational policy. Congress enacted the statute which was applied in this case. The court found that the Board did not comply with the statute. Had there been no statute of course, there would have been nothing in the law on which to base the decision. It is the statute that gives direction as to what is required. The court reiterates these standards and the distinction between meeting the requirements of the law on the one hand and determining educational policy on the other in passing judgment on the School District Board's plan.

The statute requires that the Board take "appropriate action" to overcome language barriers which impede equal participation in instructional programs. This court has found that a language barrier exists which impedes the teachers' attempts to teach reading of standard English to students who speak "black English" in their homes. Therefore, because the statute specifically

directs its attention at the School District Board, the court has directed that the School District Board provide a plan that the Board considers "appropriate action." Since the language barrier was found to be a barrier on the part of the teachers, the court suggested that the plan should be directed at assisting the teacher.

However, attention should not be diverted from the goal of an educational policy by the formal requirement of the statute. That goal is to teach the child to read. The program's ultimate beneficiaries should be the children and, although the structure of the program must be directed at the teachers, the children must always be considered as the final recipients of the program and its success must be measured by their success in reading.

The plan before the court is the effort on the part of the defendant School District Board to provide a program to comply with the law. It is the court's obligation to determine if that plan complies with the law. It is not necessary nor would it be appropriate for the court to make judgments as to whether the plan is or is not the best plan to accomplish the purpose. To do so would put the court into a position of making judgments on what is sound educational policy and would make the court the arbiter of educational policy. This is not what § 1703(f) suggests. Section 1703(f) requires that the Board take appropriate action to overcome the language barriers. What action is appropriate should be judged simply in light of existing knowledge on the subject. If there is substantial existing knowledge on the subject that supports the position taken by the School District Board, then this court's obligation is to find that the plan complies with the law.

The plan submitted by the defendant in this case has as its goals the following:

A. help the professional staff of King Elementary School to appreciate and understand the features, characteristics, and background of black English dialect;

B. train the professional staff of King Elementary School to identify children in their classes who may speak black English as their only dialect, as a dominant dialect, or as a second dialect;

C. assist the staff at King Elementary School to respond appropriately to the needs of children who speak black English when providing instruction in reading standard English;

D. establish a consultation liaison with an external agent that insures ongoing exchange of the latest professional information on black English and its role in learning to read standard English;

E. help the professional staff of King Elementary School to better communicate to parents the continuing need for parental input and support.

To carry out these goals, the Board suggests a two-part plan. An inservice program for teachers of instruction in general language and dialect concepts including "the contrasting features of black English and standard English, the identification of black English speakers, the accommodation of code-switching needs in black English speakers, and the use of knowledge of dialect differences to help individual students read standard English. The plan will include both a formal motivational and instructional inservice component and a classroom reinforcement and implementation inservice component. These two components will insure that staff receive both the formal inservice instruction and the support and help in applying newly gained knowledge in the classrooms."[1]

1. The details of the plan are as follows:
   A. Formal Instructional Component
   1. Objectives: Upon completion of this formal instructional component, inservice participants should:
   a. recognize generally the basic features of a language system as they apply to dialect differences.
   b. be able to describe in general the concept of a dialect and dialect differences within the English language.
   c. be sensitive to the value judgments about dialect differences which people often make and communicate to others.
   d. be able to describe the basic linguistic features of black English as it contrasts with standard English.

e. show appreciation for the history and background of black English.

f. recognize readily children and adults speaking the black English dialect.

g. be able to identify without prompting the specific linguistic features by which they recognized a speaker of black English dialect.

h. be able to discuss knowledgeably the important linguistic issues in code switching between black English and standard written English.

i. be able to identify possible instructional strategies that can be used to aid children in code switching between black English and standard English.

j. use miscue analysis strategies to distinguish between a dialect shift and a decoding mistake when analyzing an oral reading sample.

k. be able to describe a variety of language experience activities that can be used to complement the linguistic basal reader program.

2. Operational Details: Instructional Component

a. A total of at least 20 hours of formal instruction will be provided at a time and place to be arranged in consultation with the principal and staff of King Elementary School and the Ann Arbor Education Association.

b. That instruction will commence on or about October 15, 1979, and be completed by no later than March 15, 1980, per a calendar of inservice sessions agreed to in consultation with the principal and staff of King Elementary School and the Ann Arbor Education Association.

c. The instructional team for this instructional component will include:

—Dr. Thomas Pietras, Director of Language Arts, Ann Arbor Public Schools— Instructional Leader (See Résumé in Appendix B.)

—King Elementary School Language Arts Consultant (to be named later)

—An external consultant in linguistics and reading (to be named later)

—Other Ann Arbor Public Schools elementary language arts consultants as needed

—Specific King Elementary School professional staff with expertise to share

d. Specific instructional materials for the workshops will be drawn from the following pool of materials. Other materials may be substituted as they are identified.

RESOURCES

Abrahams, R. and R. Troike. *Language and Cultural Diversity in American Education.* Englewood Cliffs: Prentice Hall, 1972.

Burling, Robbins. *English in Black and White.* Holt, Rinehart, and Winston, 1973.

Cagney, Margaret A. "Children's Ability to Understand Standard English and Black Dialect." *The Reading Teacher,* Vol. 30, No. 6, March, 1977.

Cramer, Ronald L. "Dialectology—A Case for Language Experience." *Reading Teacher,* October, 1971, pp. 33–40.

Goodman, Kenneth S. and Catherine Buck. "Dialect Barriers to Reading Comprehension Revisited." *The Reading Teacher,* October, 1973, pp. 6–12.

Goodman, Yetta M. and Rudine Sims. "Whose Dialect for Beginning Readers?" *Elementary English,* Vol. 51, September, 1974, pp. 837–841.

Hoover, Mary Rhodes. "Characteristics of Black Schools at Grade Level: A Description." *The Reading Teacher,* April, 1978.

Johnson, Kenneth R. "Black Dialect Shift in Oral Reading." *Journal of Reading,* April, 1975, pp. 535–540.

Johnson, Kenneth R. and Herbert D. Simons. "Black Children's Reading of Dialect and Standard Texts. A Final Report." April, 1973, E.D. 076978.

Laffey, James and Roger Shuy. *Language Differences: Do They Interfere?* International Reading Association, 1973.

Pietras, Thomas P. "Teaching As a Linguistic Process in a Cultural Setting." To be published by *The Clearinghouse,* 1979.

Pietras, Thomas P. "Teacher Expectancy Via Language Attitudes: Pygmalion from a Sociolinguistic Point of View." *The Journal of the Linguistic Association of the Southwest,* Vol. II, Nos. 3 and 4, December, 1977.

Pietras, Thomas P. "Teacher's Verbal and Nonverbal Behavior as Indices of Teacher Expectancy." *Resources in Education,* November, 1978, Educational Research Information Clearinghouse, No. ED 156627.

Postman, Neil and Charles Weingartner. *Linguistics: A Revolution in Teaching.* Delta Book (paperback), 1956.

Shuy, Roger. *Discovering American Dialects.* Urbana, Illinois: National Council of Teachers of English, 1967.

Audio and/or video-taped samples of spoken black English.

e. All King Elementary School professional staff will receive a stipend for their participation beyond the contractual day as agreed upon with the Ann Arbor Education Association.

f. Participants will include all professional staff who are regularly assigned to King Elementary School. Staff who have completed a formal course in black English from a recognized college or university and whose transcript so indicates may be excused from this component of the inservice program. Staff in art, music, and physical education will not be expected to attend those workshop sessions that deal specifically with reading instruction.

B.  Classroom Application Component
    1. Objectives: Upon completion of this component, inservice participants should:
        a.  be able, using a variety of informal techniques, to identify students in their class who speak black English;
        b.  be able to recognize specific problems encountered by individual black English speakers *attempting to read standard English*;
        c.  be able, in the classroom setting, to distinguish between a dialect shift and a decoding mistake as a black English speaking student is orally reading from standard English material;
        d.  have incorporated into their reading program appropriate language-experience activities;
        e.  use a variety of possible instructional strategies to help black English speaking students learn to read standard English.
    2. Operational Details: Implementation Component
        a.  A series of 3 or 4 one hour follow-up seminars will be scheduled for appropriate Wednesday afternoons as selected by the principal and staff beginning in February and *extending until the end of the school year*. These seminars will have the purpose of encouraging classroom teachers to help each other with problems encountered in applying what they have learned in the workshops. It will also allow for the introduction of outside expertise to help address these problems as the staff sees the need.
        b.  For the 1979–80 school year, a language arts consultant will be assigned full time to King Elementary School. The individual so assigned will have a strong background in reading, extensive knowledge of black English, and experience in teaching black English speaking students. During this period (1979–80), the Language Arts Consultant will have an expanded role. The Language Arts Consultant:
            —will carry an instructional caseload of *five to ten high-need students* (including not but exclusively black English speaking students);
            —will provide diagnostic help with individual students as requested by the teachers;
            —may work in the classrooms with the teachers during reading instruction (at the teacher's request);
            —may demonstrate in the classroom instructional strategies introduced in the seminar (at the teacher's request);
            —will secure additional materials as requested by the classroom teachers;
            —will either personally help or secure other assistance for a teacher who requests further inservice instruction in an area introduced in the workshops.

        c.  This component will be required of all professional staff who have either a direct or related responsibility for reading instruction.
        d.  The instructional team for the implementation component will include:
            —Mrs. Rachel Schreiber, Principal, King Elementary School (Instructional Leader)
            —The King Elementary School Language Arts Consultant
            —Other Ann Arbor Public Schools Language Arts Consultants as invited.
            —An external expert consultant in reading (to be identified later)
            —Dr. Thomas Pietras, Director of Language Arts, Ann Arbor Public Schools
            —Specific King School teachers who wish to share expertise with colleagues
        e.  King Elementary School staff will not receive a professional inservice stipend for this component, since it is expected that the work can be carried out within the contractual day.
C.  The Reading Program at King Elementary School
    Since His Honor has requested that the plan speak to "the exact steps to be taken . . ., (2) to use that knowledge in teaching such students how to read standard English," it is appropriate that we describe briefly the reading program at King Elementary School, first, because it is changing this year as the district implements a more contemporary reading program, and second, because the inservice program will highlight certain features of that program.
    1.  The staff at King Elementary School have selected and are in the process of implementing the linguistic basal reading program produced by the Houghton-Mifflin Company. Following is a description of that program prepared by Dr. Pietras:

---

The Houghton-Mifflin Reading Program
    As children approach the task of learning to read, they have as their main challenge "breaking the code" in reading. This process has two (2) essential parts which are: (1) phonics (accurately associating letters with the sounds they symbolize) and (2) comprehension (extracting meaning from what is read).
    The Houghton-Mifflin Program provides these two parts. The kindergarten through grade six component of this basal reading series can be divided into three sections:
    1.  The pre-reading section called "reading readiness," provides skills basic to beginning reading such as auditory and visual discrimination between sounds and letters, left to right progression, beginning development of listening and oral skills.
    2.  The primary section (grades 1–3) emphasizes basic skills such as word attack, listening, and specific comprehension exercises children need to master if they are to learn to read.

The plan provides for a significant number of persons to manage and supervise the project and a method of evaluation, together with a budget to pay for its cost.

3. The intermediate section (grades 4–6) lessens the emphasis on word-attack skills and begins to stress comprehension, study, and literary-appreciation skills. Children need to master these so they can: (1) cope with extracting meaning from reading material independently, (2) study informative material effectively, (3) use reference aids efficiently, and (4) read for different purposes.

2. The Houghton-Mifflin Reading Management system is also being implemented at King Elementary School to complement the basal program. This system of developmental reading skills and periodic progress tests provides careful monitoring of each child's reading skill development. The system supplements and corroborates the teacher's professional insights as he/she works with each child.
3. Language-experience activities are used as a supplement and complement to the basal program as appropriate. Many such language-experience activities are already described in the Houghton-Mifflin manual. Such experiences are particularly beneficial to black English speaking students who are having code-switching difficulties.
4. Additional reading materials are provided in each classroom to supplement the basal reading program. Particular attention is given to materials which provide additional practice in hearing sound-symbol relationships (phonics).
5. The library is constantly used to provide a rich source of student books for sustained silent reading.

We are of the opinion that this approach to reading instruction is reasonable and rational in light of knowledge on the subject. In that regard, two very recent reports corroborate our views:

Kean, Michael H., et al. *What Works in Reading: The Results of a Joint School District/Federal Reserve Bank Empirical Study in Philadelphia.* Office of Research and Evaluation, Philadelphia Public Schools, May, 1979.

Hoover, Mary Rhodes. "Characteristics of Black Schools at Grade Level: A Description." *The Reading Teacher,* Vol. 31, No. 7, April, 1978.

VI. Implementation Details
A. Timeline
1. It is expected that the entire program can be completed in one school year (1979–80).
2. Component No. 1: Motivation and Instruction will run from about October 15, 1979, to no later than March 15, 1980.
3. Component No. 2: Reinforcement and Implementation will run from about December 1, 1979, to June 15, 1980.
B. Resources and Materials
1. Each inservice participant will receive individual copies of selected materials to be studied closely in the workshops.
2. A modest professional library of carefully selected books and articles will be available from the King Elementary School media center.
3. Prepared tapes of black English and contrasting standard English language samples will be available in the King School media center.
4. A full-time Language Arts Consultant will be assigned to King Elementary School for the 1979–80 school year. This represents an expansion of .5 full-time staff equivalent over what is normally available at King Elementary School.
5. At least 40 hours of external expert consultant time in both linguistics and reading will be contracted.
6. Fifteen percent of Dr. Pietras' time and five percent of Dr. Hansen's and Dr. Cranmore's time will be dedicated to the project.
7. A professional inservice stipend will be provided to each teacher to compensate for time spent in the program beyond the contractual day.
C. Supervision and Management
1. The project will be supervised by a management team consisting of the following people:
—Dr. Lee H. Hansen, Associate Superintendent for Curriculum and Instruction (Team Leader) (See résumé in Appendix B.)
—Dr. Robert Potts, Assistant Superintendent for Human Relations and Community Services (See résumé in Appendix B.)
—Mrs. Rachel Schreiber, Principal, King Elementary School
—Dr. Marion Cranmore, Director of Elementary Education
—Dr. Thomas Pietras, Director of Language Arts (See résumé in Appendix B.)
—King Elementary School Ann Arbor Education Association Representative
—Two (2) King Elementary School teachers selected at large by the staff
—King Elementary, School Language Arts Consultant
—Citizen-at-large: Dr. Percy Bates, Associate Dean, School of Education, The University of Michigan
2. This team will meet at least once every three weeks to monitor progress, to solve problems, and to plan the details of future activities.

The plaintiffs have criticized the plan submitted by the School District Board in the following respects.

They suggest that an additional goal should be added to the plan in the following language: "help the professional staff of King Elementary School to implement the Humaneness Plan with specific concern for its application to black children whose home language differs from the English taught in public school." They also suggest that the parents of the plaintiff children should be consulted on a regular systematic basis in connection with the goals of the plan. They further suggest that where the plan calls for help to the teachers by the Language Arts Consultant "as requested by the teachers," the plan should provide this assistance on a "regularly scheduled basis" and that the Language Arts Consultant should bear the responsibility for "the securing of additional materials" instead of leaving this choice to the teachers with the help of the Language Arts Consultant. Plaintiffs also suggest that the teachers should be proscribed from providing any special assistance under the plan separately from the rest of the class. The plaintiffs also suggest that the Supervision and Management team should include two representatives chosen by persons representing the plaintiff children and that "The mothers of the named plaintiff children shall be notified about the time and place of team meetings and permitted to attend." The plaintiffs also suggest that counsel representing the plaintiff children should have veto power over the selection of the external expert consultant in linguistics and reading.

These matters might be quite appropriate for inclusion in a plan of the kind envisioned by the court's earlier opinion and might be considered appropriate had they been proposed by the defendant School District Board. However, it is not the obligation of this court to determine educational policy. These matters involve a judgment regarding educational policy. For the court to step in and make a determination on any of these matters would inject the court into the matters of educational policy not envisioned by the congressional enactment. There is substantial evidence in the record to support the decision of the School Board on the proposals made by the Board. Although there is also substantial evidence to support suggestions made by the plaintiffs, the educational policy is to be determined by the School District Board. The law is to be interpreted by this court. If the proposals are rational in light of existing knowledge as established in this case, they should be approved.

Finally, the plaintiffs suggest two additions not involving educational policy to the proposal made by the Board. They suggest that additional language should be inserted in the part of the plan dealing with the time schedule. The language suggested is as follows: "This plan shall satisfy the requirements of the court within the time period specified unless plaintiffs can demonstrate to the court that there has not been substantial compliance in good faith. If such a showing is made, this court may provide such other relief as is necessary to assure the implementation of its order of July 12, 1979." They also suggest that their counsel should also receive the evaluation reports when they are distributed.

The court believes that the suggested additional language is not necessary in the plan. It is clear that if the defendant School District Board makes an effort to subvert the thrust of the court's earlier ruling, it can again be brought before this court for further action. On the other hand, it does seem appropriate to the court that plaintiffs' counsel should be permitted to see the evaluation reports that are distributed. This clearly is not a matter that deals with educational policy but deals specifically with providing information to help the court determine whether the program is being carried out properly within the framework of the law.

The court itself has some question about the adequacy of the plan proposed. The question does not involve itself with educational philosophy or policy but with the adequacy of the methods proposed to evalu-

ate the plan. The plan suggests a method of evaluation as follows:

Evaluation activities will concentrate on providing evidence 1) that the inservice program is being implemented in accordance with the plan, 2) that a good-faith effort is being made to comply with the Order, and 3) that the program is judged worthy of expansion to the other elementary schools of the district. All evaluation reports will be distributed to the Board of Education, His Honor, the Superintendent and his Cabinet, the project management team, and the King Elementary School staff. Evaluation reports will be available to the press and the community. The following activities are planned:

A. A written anecdotal summary of each inservice workshop will be prepared and distributed by the management team no later than five days following each inservice session. The summary will include: a list of participants present, an outline of major activities, and a summary of participant reactions.

B. A more general progress report will be issued by the management team every 60 days.

C. An evaluation questionnaire will be distributed to all participants at the close of each inservice workshop. These data will be summarized in the anecdotal summary of each workshop session.

D. A comprehensive survey of staff reactions will be administered at the close of the year.

E. An external expert consultant in linguistics and reading will visit a random sample of 50 percent of the teachers during reading class on at least two different occasions. In addition, the consultant will briefly interview each teacher following the observation. The purpose of the observation and interview is to determine the extent to which teachers are attempting to implement material presented in the inservice workshops. The consultant's reports will be general in nature and will not mention or allude to individual staff members.

This evaluation proposal is largely directed at an evaluation of the inservice training program. This is good but does not seem to the court to be sufficiently comprehensive to determine whether in the long run the action of the Board is "appropriate" as that term is used in the statute.

As pointed out before, the ultimate beneficiaries of the plan should be the children and a part of the effort of evaluation should be aimed at determining whether or not, and if so the extent to which, the children have been assisted in learning to read. In other words, an additional component should be added to the evaluation part of the plan. The Board must determine not only if the barriers are being overcome but also must determine if the impediments to equal participation in the instructional programs are being overcome (as evidenced by the students' progress in attaining reading skills). The court suggests specifically that the evaluation part of the plan be broadened to report changes in the reading skills of the children and if possible the effect the plan has had on these skills.

The court finds that the persons who drafted the plan are highly qualified educators and qualified to suggest a plan involving the education of the children in this case. It finds that the plan does take into consideration existing knowledge on the subject, and it is suggested in good faith to comply with the court's order of July 12, 1979. It seems to the court that the School District Board has suggested steps that are supported by the evidence in this case and existing knowledge on the subject to help the teachers recognize the home language of the students and to use that knowledge in their attempts to teach reading skills in standard English, and to thus overcome the language barrier that was shown to exist in this case.

The court finds that, except as otherwise indicated herein, the plan meets the test of reasonableness and rationality in light of

knowledge on the subject and that it embraces within its terms the persons directly involved in the education of the plaintiff children.

Finally, it should be indicated that the court is not approving or adopting the plan proposed but is indicating and declaring that in its judgment under the facts of this case, the plan as modified complies with the law as stated by Congress.

Having thus indicated its decision on the plan, it is appropriate again to underscore a major premise involved in the adoption of the statute and its application by this court to the facts of this case. This has been alluded to earlier in the court's opinion when attention was directed to the children in this case:

A major goal of American education in general, and of King School in particular, is to train young people to communicate both orally (speaking and understanding oral speech) and in writing (reading and understanding the written word and writing so that others can understand it) in the standard vernacular of society. The art of communication among the people of the country in all aspects of people's lives is a basic building block in the development of each individual. Children need to learn to speak and understand and to read and write the language used by society to carry on its business, to develop its science, arts and culture, and to carry on its professions and governmental functions. Therefore, a major goal of a school system is to teach reading, writing, speaking and understanding standard English. (Court Order of July 12, 1979, pp. 2 and 3).

It is the hope of this court that the wisdom of Congress in enacting this statute and this court's application of that statute to the facts of this case will be a step to keep another generation from becoming functionally illiterate. The court has recognized and the evidence suggests that there are in this case many other factors which adversely affect the process of learning to read. Absences from class, classroom misbehavior, learning disabilities, and emotional impairment contributed to this problem. It is also probable that lack of reading role models has a significant impact on the problem. The evidence does suggest, however, that a coordinated program involving the appropriate use of programs available under other existing statutes, the skill and empathy of the King teachers, and the plan adopted by the School District Board in this case makes it likely that the problems can be diminished and that the goal of teaching reading in standard English can be achieved.

So ordered.